United States District Court
For the Northern District of California

1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
8                           SAN FRANCISCO DIVISION
9
10
11  KERILEI R. OLDOERP,                        No. C 08-05278 RS
12          Plaintiff,                         **FINDINGS OF FACT AND
                                               CONCLUSIONS OF LAW**
13      v.
14  WELLS FARGO & COMPANY LONG
    TERM DISABILITY PLAN;
15  METROPOLITAN LIFE INSURANCE
    COMPANY,
16
            Defendants.
17  _____/
18
19                      I.      INTRODUCTION
20          This action began in November 2008 when Kerilei Oldoerp sued Wells Fargo & Company

21  Long Term Disability Plan and Metropolitan Life Insurance Company ("MetLife"), challenging the

22  denial of her claim for long-term disability benefits.  Following a bench trial in 2011, an order was

23  issued finding that MetLife had not abused its discretion in denying Oldoerp's claim.  The order

24  applied an "abuse of discretion" standard because certain MetLife Summary Plan Description (SPD)

25  documents confer significant discretionary authority upon MetLife.  *See Firestone Tire & Rubber*

26  *Co. v. Bruch*, 489 U.S. 101, 115 (1989) (courts review denial of benefits "under a *de novo* standard

27  unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

28  eligibility for benefits or to construe the terms of the plan.").  Subsequent to that decision, the

United States District Court

For the Northern District of California

1   Supreme Court in a separate action determined that extraneous documents, like SPDs, "[are] not

2   [themselves] part of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011).  Accordingly, in

3   this case, the Ninth Circuit reversed on appeal, holding that MetLife's decision is subject to *de novo*

4   review, not an abuse of discretion standard.  Based on subsequent oral argument, the parties' written

5   submissions, the administrative record, and some additional extrinsic evidence, the court finds that

6   MetLife erred in denying Oldoerp's claim.  This order comprises the findings of fact and

7   conclusions of law required by Federal Rule of Civil Procedure 52(a).[1]

8                             II.      EVIDENTIARY RULINGS

9               Ordinarily, cases arising under the Employee Retirement Security Act of 1974 (ERISA), 29

10   U.S.C. § 1001 *et seq.*, are decided solely on the basis of the administrative record that was before

11   the plan administrator at the time its decision was made.  *See Kearney v. Standard Ins. Co.*, 175

12   F.3d 1084 (9th Cir. 1999) (en banc) ("If a court reviews the administrator's decision, whether de

13   novo . . . or for abuse of discretion, the record that was before the administrator furnishes the

14   primary basis for review.").  In some cases, however, additional evidence may be admitted "to

15   enable the full exercise of informed and independent judgment."  *Mongeluzo v. Baxter Travenol*

16   *Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995).  At trial, both Oldoerp and

17   MetLife moved to admit extrinsic documents.  Oldoerp proffered her Social Security Administration

18   (SSA) file, which contains additional medical records not included in the administrative record.  The

19   file was admitted, as it is "necessary . . . for an adequate *de novo* review."  (ECF No. 72, Nov. 25,

20   2013) (quoting *Mongeluzo*, 46 F.3d at 943).  MetLife submitted extrinsic documents allegedly

21   showing that, during the pendency of Oldoerp's disability claim, she opened a dance studio with her

22   husband.  This evidence was excluded, as MetLife failed to explain why it was admissible under

23   *Mongeluzo*.  *See* 46 F.3d at 943.

24               In light of the admission of Oldoerp's SSA file, the parties were instructed to submit

25   supplemental briefing addressing the significance of the newly-admitted evidence.  *Id.*  MetLife's

---

[1] To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Tri–Tron International v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975).

United States District Court

For the Northern District of California

supplemental briefs rely in significant part on two additional pieces of extrinsic evidence: a vocational report by Susan Simoni and an Independent Physician Consultant (IPC) report by Dr. Clayton Hauser.  The Hauser and Simoni reports, both of which were prepared in December 2013 following the request for supplemental briefing, purportedly serve to undermine Oldoerp's claim that she was entitled to additional benefits under the MetLife LTD plan.  As in its prior attempt to rely on extrinsic evidence, MetLife does not explain why these documents should be admitted.  In any event, this newly-proffered evidence plainly is not necessary for an adequate de novo review.  *See id.* (circumstances must "clearly establish" that extrinsic evidence is necessary for an adequate de novo review).  Accordingly, the Huser and Simoni reports are excluded as inadmissible.  Any references thereto will not be considered and are hereby stricken from MetLife's supplemental briefs.

## III.    FINDINGS OF FACT

A. <u>Oldoerp's Occupation</u>

Kerilei Oldoerp began working for Wells Fargo after graduating from college in 1994.  By 2007, she had risen to the position of Operations Manager.  In this capacity, she engaged in various tasks pertaining to management, sales, budgeting, and development.  (AR 825).  According to a job description form completed by her employer, Oldoerp's position entailed the following:

> Directs a team of implementation consultants and/or operations analysts in the successful implantation planning, solution preparation, delivery to the field, and measurement of initiatives that are the most highly complex and strategic in nature. Works with project managers to define projects/goals and design the appropriate communications, learning, business process model and/or timing/bundling for implementation. Assists or determines size, scope, impacts, risk, budget and strategy for initiatives that are corporate wide and have substantial impact to bottom line. Provide requirements, tools, direction and oversight to business units performing their own solution preparation (for less complex projects) to ensure standards are met[.]

(AR 778).  According to Wells Fargo, this position required approximately five to six hours of sitting, one to two hours of standing, one to two hours of walking, three to four hours of repetitive hand use, and occasional lifting of up to twenty pounds.  (AR 776).

B.   The Wells Fargo LTD Plan

Oldoerp was a participant in her employer's long-term disability (LTD) benefits plan, for which Wells Fargo is the sponsor and MetLife is the provider and insurer.  (AR 109; AR 118).  The terms of the plan are laid out in the Wells Fargo Benefits Book, which describes a number of benefits available to the company's employees.  (AR 98-506).  Chapter 1 covers Administrative Information and states that the Benefits Book includes Summary Plan Descriptions (SPDs) for most of the benefit plans offered by Wells Fargo.  (AR 105-06).  Chapter 14 of the Benefits Book is devoted to the LTD Plan.  (AR 358-75).  The first page of that chapter states that, along with the Administrative Information from chapter 1 and the glossary, it constitutes the SPD for the Wells Fargo & Company Long Term Disability Plan.  (AR 358).

According to the SPD, a claimant is "disabled" or has a "disability" when "due to sickness (including a mental or nervous condition), pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis . . . and you are unable to earn more than 80 percent of your predisability covered pay or indexed covered pay at your own occupation for any employer in your local economy."  (AR 361).  After two years, the continuation of LTD benefits depends on the claimant being able to earn more than 60 percent of prior income in "any gainful occupation."  *Id.*  The Benefits Book sets forth procedures for submission of claims, determinations approving or denying claims, review of claims that have been denied, and information regarding the participant's rights under ERISA.  (AR 371-373).  A claimant must submit proof in support of her claim.  (AR 371).

C.   Oldoerp's Condition and Treatment

Oldoerp stopped working in August 2007, reporting a host of symptoms including pain, fatigue, and depression.  Throughout the following ten months she sought treatment from a variety of medical professionals.  As time passed, the attending professionals developed various theories explaining Oldoerp's symptoms.  They were also asked, at various points, to provide information to MetLife in response to inquiries about Oldoerp's condition.

i.      Mayo Clinic

United States District Court
For the Northern District of California

1    Oldoerp was examined by several doctors at the Mayo Clinic in August 2007.  On August

2    13, 2007, Dr. Timothy Daley reported that Oldoerp had "subacute onset of fatigue, sore throat, and

3    malaise, with a severely disabling form of fatigue over the last week." (SSA 85).  Her lymph nodes

4    were observed as being swollen and tender.  *See id.* ("There is marked posterior occipital

5    lymphadenopathy with multiple swollen and tender nodes.").  Two days later, Mayo Emergency

6    Room Doctor Roland Petri observed that Oldoerp's symptoms persisted.  He concluded that "the

7    patient likely has an underlying viral etiology causing her symptoms." (SSA 83).  On August 17,

8    Oldoerp met with Dr. Cynthia Stonnington, a Mayo psychiatrist.  Stonnington noted that Oldoerp

9    filled out a Beck II Depression Inventory and scored a 45, which is "indicative of quite severe

10   depression." (SSA 81).  She concluded that Oldoerp was experiencing "Major depression, single

11   episode." (SSA 82).  Stonnington prescribed psychiatric medications and concluded that "it would

12   be counterproductive for Ms. Oldoerp to be going to work, given the level of her depression and

13   fatigue." *Id.* On August 20, Oldoerp was examined by Doctor Sophie Bersoux.  Bersoux provided

14   Oldoerp with a note recommending that she stay home from work until August 31, 2007 while

15   acclimating to her new medication regimen.  (SSA 80).

16            ii.     Michelle Onacki

17   Michelle Onacki, a psychiatric nurse practitioner, began treating Oldoerp in August 2007.  In

18   a report provided to MetLife in October 2007, Onacki reported that Oldoerp had a psychiatric

19   disability beginning in August.  (AR 859).  She observed that Oldoerp suffered from extreme

20   exhaustion.  (AR 857).  In a document sent to MetLife on October 1, 2007, Onacki indicated that

21   Oldoerp could not return to work because she had extremely low energy and suffered from

22   depression.  (AR 866-69).  Onacki estimated that Oldoerp could return to work part time, for four

23   hours per day for two weeks, on November 1, 2007. *Id.* As to the severity of her depression,

24   Onacki rated Oldoerp an "eight" on a ten-point scale, where higher numbers corresponded to higher

25   levels of functionality. *Id.* Attached to Onacki's evaluation was a "mental status examination" from

26   August 30, 2007, where Oldoerp was rated as having a well-groomed appearance, an alert level of

27   consciousness, cooperative behavior, good eye contact, normal speech, coherent thought process,

28   and relevant thought content.  (AR 869).  Onacki further reported that Oldoerp's cognitive functions

No. C 08-05278 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW

were intact, her intelligence was above average, and her abstract thought, capacity to form good judgment, and insight were all fair. *Id.* Oldoerp's mood/affect, however, was described as "depressed." *Id.*

Onacki's reports indicate that, as time passed, Oldoerp's condition was declining. On October 9, 2007, in responses on a questionnaire from MetLife, Onacki reported that Oldoerp was unable to perform work duties due to her exhaustion and inability to maintain personal hygiene without assistance. (AR 857). She stated that it was unknown, at that time, when Oldoerp would be able to return to work. *Id.* On an "initial functional assessment form," Onacki indicated that she observed the primary psychiatric symptoms of depression and fatigue. (AR 859). She rated Oldoerp's functional capabilities at the lowest level on the form, indicating "extreme inability to function in most areas due to continuous impairment." (AR 860). On the "mental status examination" form, Onacki remarked that Oldoerp "appears very tired," but her general appearance was rated as "well-groomed." (AR 863). She assessed all other categories the same as she had in her August report, including behavior, thought process and content, and cognitive functions. (AR 863; 869). On January 31, 2008, Onacki reported that Oldoerp was presently incapacitated and declined to specify a return to work date. (AR 781-85). According to Onacki, medical facts relevant to Oldoerp's apparent inability to work included extreme exhaustion, feeling the need for more sleep, disinterest in daily activities, panic attacks, difficulty concentrating, generalized anxiety, and depression. (AR 784).

### iii.    Dana Rosdahl

On October 20, 2007, Dana Rosdahl, Ph.D., a nurse practitioner specializing in internal medicine, provided information to MetLife about an office visit with Oldoerp. (AR 848-49). Rosdahl indicated that Oldoerp's extreme fatigue was a functional limitation preventing her from working. (AR 848). In describing Oldoerp's mental status, Rosdahl stated that she had a pleasant affect, was able to answer questions appropriately, and showed logical thought content and flow. *Id.* At that time, Rosdahl estimated that Oldoerp could return to work in January 2008. *Id.*

Dr. Rosdahl again met with Oldoerp on December 28, 2007 and completed an Attending Physician Statement (APS). (AR 801-04). The APS is a form provided by MetLife to the treating

United States District Court

For the Northern District of California

1  physician requesting information for MetLife's use in making disability determinations.  *Id.*  The

2  form includes questions on the patient's diagnosis and treatment, functional and physical

3  capabilities, and prognosis for returning to work.  These questions require either a short answer or a

4  selection among provided responses.  *Id.*  On the December APS, Rosdahl indicated that Oldoerp's

5  primary diagnosis was chronic fatigue and her secondary diagnosis was depression.  (AR 801).

6  Under psychological functions, Rosdahl rated Oldoerp as "class four" out of five, where class five

7  represents the lowest level of functioning.  (AR 802).  With her psychological functions rated as

8  "class four," Oldoerp was judged unable to engage in stressful situations or in interpersonal

9  relations.  *Id.*  Rosdahl further reported that Oldoerp could sit, stand, or walk for one hour

10  intermittently.  *Id.*  She could lift up to ten pounds occasionally, but would be unable to engage in

11  repetitive hand motions.  *Id.*  For prognosis, Rosdahl wrote that Oldoerp was unable to perform

12  activities of daily living, "let alone work responsibilities."  *Id.*  She gave exhaustion as the reason

13  Oldoerp was unable to perform job duties and concluded that the patient could work "zero" hours

14  per day.  *Id.*

15       Based on office visits in February 2008, Rosdahl continued to report that Oldoerp suffered

16  from extreme fatigue, lack of stamina, and an inability to complete activities of daily living.  (AR

17  765-66; 773-74).  During a February 13, 2008, office visit, Rosdahl observed that Oldoerp was

18  "smiling continuously" and had normal blood pressure.  (AR 768).  She nonetheless continued to

19  conclude that Oldoerp was "presently incapacitated" as a result of her symptoms.  (AR 776).  She

20  estimated that Oldoerp could return to work in April 2008.  *Id.*

21       On March 28, 2008, Dr. Rosdahl submitted an APS, office notes, and lab reports to MetLife.

22  (AR 717-29).  The APS evaluated Oldoerp's condition during her office visit on that same day.  (AR

23  718-721).  Oldoerp's diagnoses remained chronic fatigue and depression.  (AR 718).  In response to

24  form questions, Rosdahl made entries indicating that Oldoerp could sit continuously for six hours,

25  stand intermittently for two hours, and walk intermittently for three.  (AR 719).  She could,

26  according to Rosdahl, lift weight occasionally up to fifty pounds.  *Id.*  She would also be able to

27  perform repetitive hand motions.  *Id.*  Rosdahl further reported that Oldoerp's psychological

28  functions showed slight limitations, as she could function in most "stress situations" and engage in

United States District Court

For the Northern District of California

interpersonal relations.  *Id.*  On a scale of one to five, Oldoerp was rated class two out of five, where class one represented no limitations of psychological functions.  *Id.*  Rosdahl indicated that she had advised Oldoerp to return to work "immediately" to her regular occupation on a part time basis.  *Id.* Specifically, she reported that Oldoerp could work for twenty hours a week, five hours per day, but "breaks must be allowed."  *Id.*  Altogether, in comparison to the APS submitted by Rosdahl on December 28, 2007, the updated report indicated that Oldoerp's condition was somewhat improved. (AR 718-19; AR 801-02).

     iv. Stephen Fry

  On November 11, 2007, Dr. Stephen Fry summarized self-reported symptoms from Oldoerp, who was apparently a new patient at Airpark Medical Center: "She's been fatigued for the past 3 months.  She sleeps 12-16 h. per day.  She also has sore throat, neck pain.  Her legs and knees muscles [sic] hurt.  She had headaches, tinnitus."  (SSA 52).  On December 27, 2007, he observed "she is actually starting to feel better on the [psychiatric] med and would like to continue."  (SSA 53).

  On January 29, 2008, Fry provided information to MetLife reporting that functional limitations related to strength, concentration, and pain were interfering with Oldoerp's ability to work.  (AR 786-88).  He indicated that she was presently incapacitated and did not estimate a future date on which she could resume working.  (AR 788).  On February 11, 2008, he observed "she's doing better w/ less pain and less myalgia and arthralgia."  (SSA 54).  On April 3, 2008, Dr. Fry wrote a letter to MetLife stating that he believed Oldoerp suffered from myalgia, arthralgia, and fatigue best categorized as chronic fatigue syndrome.  (AR 691).  He believed that her chronic fatigue syndrome was "most probably" caused by a pathogen of the Bartonella species.  *Id.*  He also indicated that, due to Oldoerp's insurance, he was unable to conduct "specialized laboratory testing."  *Id.*  Oldoerp was responding to the medication Azithromycin "with improvement," but Dr. Fry noted that Oldoerp would probably continue to relapse and then improve over a period of time. *Id.*  He did not offer any statement on her ability or inability to return to work.  *Id.*

v.      Becky Simonelic

Dr. Becky Simonelic, a psychologist, began seeing Oldoerp in June 2006.  In a letter sent to the Social Security Administration on March 12, 2008, Simonelic noted that Oldoerp's "severe chronic fatigue" and muscle pain, which "made it impossible for her to return to work" beginning in 2007, had "continue[d] to the present."  (SSA 45).  In a report dated March 21, 2008, Simonelic, who had been observing Oldoerp in regular counseling sessions, reported that Oldoerp appeared unusually fatigued since August 2007.  (AR 756-57).  According to the report, these sessions occurred on a weekly basis.  *Id.*  Simonelic further stated that Oldoerp's condition rendered her "unable to perform any of her job functions, such as meeting attendance/facilitation, speaking/presentations, prolonged reading, planning or analysis."  (AR 756).  She concluded Oldoerp's physical chronic fatigue and fibromyalgia "make it impossible for her to even *be* in the workplace."  *Id.* (emphasis in original).

D.  MetLife's Review of Oldoerp's Claim

After Oldoerp stopped working, MetLife granted her short-term disability (STD) benefits, initiating coverage beginning on January 13, 2008.  (AR 518-19; 692).  On November 27, 2007, Deborah Lawrence, a MetLife claim specialist, sent a letter to Oldoerp requesting additional information if Oldoerp intended to apply for LTD benefits.  (AR 838-39).  The letter stated that if MetLife did not receive the forms by December 27, 2007, it would assume that Oldoerp was no longer interested in pursuing her claim for disability benefits and would close her file.  (AR 839).  In a letter sent December 28, 2007, Lawrence informed Oldoerp that it had not received the information requested in its prior letter and was therefore closing her file.  (AR 805-06).  It informed her that she had 180 days to appeal the decision.  (AR 805).

Subsequently, Oldoerp submitted the Rosdahl APS to MetLife in support of her LTD claim.  (AR 801-04).  On January 14, 2008, C. Griffis, a nurse consultant for MetLife, conducted an initial review of Oldoerp's medical records and concluded that they did not support her claim for benefits.  (AR 544-47).  Griffis stated that most of the mental status examination findings by Onacki in October 2007 were within normal limits.  (AR 546).  Although Rosdahl diagnosed Oldoerp with chronic fatigue and depression, Griffis noted that MetLife received no office visit notes or lab test

United States District Court
For the Northern District of California

1    results. *Id.* It also had not received office visit notes or diagnostic test results from Fry. *Id.* Thus,

2    Griffis concluded that Oldoerp's file lacked clinical documentation to support functional

3    impairments that would prevent her from working as an operations manager. *Id.*

i.    Oldoerp's First Appeal

5    Lawrence, the MetLife claim specialist, sent Oldoerp a letter on January 18, 2008 stating that

6    her claim for LTD benefits was denied. (AR 791-94). The letter summarized Oldoerp's records and

7    restated Griffis's rationale for finding an absence of impairments. "[T]here is no clinical

8    documentation," the letter stated, "to support significant, ongoing impairments of your physical or

9    psychiatric functional abilities preventing you from performing your duties as an operations

10   manager." (AR 793). MetLife stated that if Oldoerp wished to file an appeal, she should provide

11   diagnostic test results and all actual office visit notes from Onacki, Rosdahl, and Fry supporting an

12   inability to perform her occupational duties. (AR 793).

13   Oldoerp appealed the decision, at which point MetLife initiated an independent physician

14   consultant (IPC) review of Oldoerp's medical records from Dr. Elyssa Del Valle, Board certified in

15   internal medicine. Del Valle submitted a report to MetLife on March 24, 2008. (AR 750-53). As

16   part of her review, Del Valle spoke with Dr. Rosdahl. (AR 752). Rosdahl mentioned that Dr. Fry

17   had found a parasitic infection, Bartonella, in Oldoerp's blood. *Id.* She further stated that Oldoerp

18   seemed improved in clinical appearance and affect at her last office visit. *Id.* Rosdahl indicated that

19   Oldoerp should be capable of returning to work on a part time basis. *Id.* Del Valle was unable to

20   speak with Dr. Fry prior to her report, but indicated she would prepare an addendum if she obtained

21   additional information from him that would alter her conclusions. (AR 753). Dr. Del Valle

22   concluded that Oldoerp suffered functional limitations from chronic fatigue syndrome and

23   Bartonella infection through February 13, 2008. *Id.* She opined that Oldoerp had been treated for

24   Bartonella "with reasonable time given to allow beneficial results." *Id.* She further determined that

25   there were no clinical findings or data that supported a conclusion that Oldoerp could not return to

26   full-time job duties. *Id.*

27   In order to review Oldoerp's psychiatric functionality, MetLife obtained an IPC from Dr.

28   Marcus Goldman, Board certified in psychiatry, on March 27, 2008. (AR 737-40). Goldman spoke

1   with Onacki, but was unable to speak with Drs. Rosdahl or Fry.  (AR 739).  He opined that the

2   mental status examinations did not contain data consistent with "severe psychopathology."  (AR

3   740).  In particular, he noted that "[t]he data are almost exclusively subjective and self reported."

4   *Id.*  He stated that loss of global functionality could not be objectively corroborated and that there

5   was no "quantified cognitive loss."  *Id.*  From a psychiatric perspective, Goldman concluded that the

6   medical information did not support functional limitations after November 30, 2007.  *Id.*  On April

7   9, 2008, he filed an addendum, noting that he had reviewed additional forms obtained from

8   Simonelic and Rosdahl.  This supplemental information did not alter his conclusion.  "There is a

9   significant lack of serial mental status examinations or other objective data," he concluded.  (AR

10   707).  "Appearing fatigued does not establish psychiatric severity."

11   MetLife provided the IPC reports to Fry and Rosdahl for their comments.  (AR 507-08).  If

12   either disagreed with the IPC reports, they were directed to provide clinical evidence to support their

13   conclusions.  *Id.*  In response, Fry provided the April 3, 2008 letter in which he indicated that he

14   believed Oldoerp's chronic fatigue was caused "most probably" by Bartonella.  (AR 691).  MetLife

15   informed Oldoerp that it had provided the IPC reports to Rosdahl and Fry and requested their

16   comments.  (AR 568).

17   Between April 7 and April 11, 2008, Karen Van Aernam, a MetLife appeals specialist,

18   prepared an appeal summary of Oldoerp's case.  (AR 571-74).  She concluded that the

19   documentation did not support functional impairment precluding sedentary or light work beyond

20   February 13, 2008.  (AR 574).  In particular, Van Aernam emphasized notes from Oldoerp's

21   February 13, 2008, visit with Dr. Rosdahl:

> Physical findings from Dr. Rosdahl indicate a smiling patient who is compliant with
> diet.  To require time beyond 2/13/2008 is excessive and the documentation does not
> indicate any physical or other clinical findings to support functional impairment that
> rises to a level that would preclude full time sedentary or light duty work beyond
> 2/13/2008 based on the laboratory results and office notes.

*Id.*  Van Aernam left a voice mail on April 11, 2008, informing Oldoerp of her LTD appeal

decision.  *Id.*  On April 18, 2008, MetLife sent Oldoerp a letter from Lawrence explaining its

United States District Court

For the Northern District of California

1  decision to approve LTD benefits through February 13, 2008.[2]  (AR 692-96).  The letter

2  summarized the reasoning provided in IPC reviews by Drs. Del Valle and Goldman.  (AR 693-95).

3  Noting that Oldoerp's psychiatric symptoms were "almost exclusively subjective and self reported,"

4  MetLife stated that Simonelic was unable to provide "specific clinical findings that indicate your

5  level of impairment due to fatigue."  (AR 694).  The letter further referenced Del Valle's conclusion

6  that Oldoerp had been adequately treated for Bartonella "with reasonable time given to allow

7  beneficial results."  (AR 695).  The letter explained that while the evidence warrants LTD benefits,

8  Oldoerp failed to demonstrate that she was entitled to benefits after February 13, 2008, when

9  Rosdahl observed "a smiling patient who is compliant with diet."  *Id.*  Oldoerp was again instructed

10  that she could appeal the decision and informed her that she should submit additional medical

11  information, including office visit notes from Fry after February 13.  (AR 695-96).

12              ii.      Oldoerp's Second Appeal

13          Oldoerp appealed again.  On April 22, 2008, MetLife acknowledged the appeal and informed

14  Oldoerp that it was conducting an independent review.  (AR 689).  Sharon O'Connor, MetLife

15  procedural analyst, handled the second appeal.  (AR 578; 630).

16          In May 2008, MetLife submitted Oldoerp's medical records for additional IPC reviews.  Dr.

17  Tracey Schmidt, Board certified in internal medicine and rheumatology, submitted her report on

18  May 5, 2008.  (AR 637-38).  In her report, Schmidt summarizes treatment notes from Michelle

19  Onacki and Drs. Bersoux, Rosdahl, and Fry.  *Id.*  The report does not offer an opinion as to whether

20  the medical information supported functional limitations.  *Id.*  Under "Comment/

21  Recommendations," Schmidt states, "Case discussed with Sharon O'Connor and would consider an

22  infectious disease consult and if need be rheumatology in the future."  *Id.*

23          On May 21, 2008, after reviewing Dr. Bono's report (discussed below), Schmidt submitted

24  an addendum concluding that the records did not support physical impairment preventing "full time

25

26  ―――――――――――
   [2] In a separate letter sent the previous week, MetLife informed Oldoerp that her STD benefits were
   extended to January 13, 2008, the maximum time allowed under the plan.  (AR 697).  The letter
27  stated that a separate decision from MetLife's LTD appeals unit was forthcoming.  Accordingly,
   Oldoerp's award of benefits through February 13, 2008, constituted five months of STD benefits
28  and one month of LTD benefits.

1   sedentary to light occupation from 02/14/08 onward." (AR 639). She notes that while Oldoerp's

2   file mentions fibromyalgia, it lacks "any notes or workup by a rheumatologist," nor does it include

3   "legible mention of the tender points needed by American College of Rheumatology to make the

4   diagnosis of fibromyalgia." *Id.* While Dr. Fry reported that pain was keeping Oldoerp from work,

5   Schmidt states that the file "lacks any notes from physical therapy, pain management or behavioral

6   therapy for brain management." *Id.* Similarly, she notes that while the file mentions fatigue, it

7   lacks any sleep studies "as a workup for her symptoms." *Id.* Noting that the file mentions

8   Bartonella and other infectious diseases, Schmidt states that she will defer to an infectious disease

9   specialist to comment on Oldoerp's functional capabilities. Similarly, she acknowledges that

10  Oldoerp has been under treatment for depression and anxiety and states that these conditions are

11  "maybe [sic] causing a mental nervous impairment but I am not qualified to comment on that." *Id.*

12      MetLife obtained an IPC report from psychologist Kevin Murphy, who completed his review

13  on May 7, 2008. (AR 673-79). Murphy spoke with Dr. Simonelic, Oldoerp's treating psychologist.

14  (AR 674). Simonelic stated that she had known Oldoerp for almost two years and that "she is

15  completely different." *Id.* Oldoerp used to be efficient and organized, she stated, but now

16  reportedly had a short concentration level and was forgetful. *Id.* Simonelic had not done a formal

17  mental status exam, but found her "oriented." *Id.* She felt Oldoerp's depression was due to physical

18  illness and that her improvement had been only slight since August. *Id.* Simonelic also reported

19  that Oldoerp was not well-groomed or well-dressed. *Id.* She further explained that while Oldoerp

20  "used to be an efficient manager, organized and on top of things," she now "has difficulty

21  remembering what to do on a given day." *Id.* This forgetfulness was demonstrated by Oldoerp's

22  failure to remember certain appointments with her, which Simonelic opined "is unlike her." *Id.* On

23  May 8, 2008, Murphy also spoke with Onacki, who reported that Oldoerp "definitely" has

24  depression, fibromyalgia, and "debilitating" chronic fatigue. *Id.* She also told Murphy that when

25  fatigued, Oldoerp "has problems with even daily living." *Id.* After review of the medical file,

26  Murphy described the evidence for functional limitations due to depression as a primary condition

27  as "not compelling," reasoning that "all the providers now appear to be in agreement that the

28  claimant's fatigue is related to a physical condition." (AR 679). He then deferred to "the

United States District Court

For the Northern District of California

1  rheumatologist reviewing the file" on the restrictions and limitations attributable to any physical

2  conditions.  *Id.*

3         Dr. Bartholomew Bono, Board certified in infectious diseases, submitted an IPC review on

4  May 15, 2008.  (AR 642-45).  He attempted to speak with Drs. Rosdahl and Fry.  (AR 643).  After

5  Fry requested written authorization from Oldoerp and confirmation that the conversation would not

6  be recorded, MetLife instructed Bono to make no further attempts to discuss the case with Fry.  *Id.*

7  Based on review of the medical records, Bono opined that the available medical records did not

8  support the diagnosis of any infectious disease, including Bartonella.  (AR 644).  In particular, the

9  records did not include antibody testing for Bartonella.  *Id.*  He stated that Oldoerp may have

10 depression, chronic fatigue syndrome, and/or fibromyalgia, but that there was no evidence of

11 infectious disease.  *Id.*  Therefore, "from an infectious medicine perspective," he concluded that the

12 medical information did not support functional limitations "effective 02/14/08."  *Id.*

13        After receiving the IPC reports from Drs. Schmidt, Murphy, and Bono, MetLife forwarded

14 them to nurse Onacki and Drs. Rosdahl, Simonelic, and Fry for comment.  (AR 630-33).  On June 5,

15 2008, O'Connor prepared a summary upholding the appeal decision.  (AR 587-90).  She sent

16 Oldoerp a letter detailing the results of the three IPC reviews.  (AR 613-16).  In the letter, O'Connor

17 includes Dr. Bono's conclusion that the medical records did not support a diagnosis of infectious

18 disease, including Bartonella.  (AR 615).  MetLife informed Oldoerp that she had exhausted her

19 administrative remedies and that no further appeal would be considered.  (AR 616).

20        On August 27, 2008, Oldoerp forwarded additional medical records and informed MetLife

21 that her claim for disability benefits had been approved by the Social Security Administration

22 (SSA).  (AR 601-07).  MetLife declined to reopen Oldoerp's case and reiterated that no further

23 administrative reviews were available.  (AR 608).

24        E.  Oldoerp's Social Security Claim

25        Oldoerp filed for SSDI benefits in early 2008 while her claim with MetLife was still

26 pending.  The SSA contacted several of Oldoerp's providers, including the Mayo Clinic, Rosdahl,

27 Onacki, Simonelic, and Fry, requesting Oldoerp's medical records.  (SSA 42, 45, 74, 91, 94).

28

United States District Court

For the Northern District of California

1      Dr. William Chaffee examined Oldoerp on June 12, 2008.  (SSA 20).  Chaffee had no

2  medical records to review at that time.  *Id.*  He rendered a diagnosis of "chronic fatigue of uncertain

3  cause associated with chronic depression and moderately severe obesity."  (SSA 22).  He further

4  noted, however, that Oldoerp had few, if any, limitations on her functional abilities.  He reported

5  that she could lift, carry, stand, and walk without restriction.  *Id.*  She also experienced no limitation

6  in sitting, hearing, speaking, or seeing.  *Id.*  There were also no restrictions in climbing, stooping,

7  kneeling, crouching, crawling, reaching, handling, fingering, or feeling.  (SSA 23).  His report

8  concluded, "The claimant apparently suffers from severe fatigue and is unable to complete an eight-

9  hour day or 40-hour workweek.  This may be due to depression, although other causes should be

10  investigated."  *Id.*  He did not diagnose Oldoerp with chronic fatigue syndrome.

11      On July 1, 2008, a doctor named "B. D'Lugoff" completed SSA Form 416, constituting a

12  case analysis and medical evaluation of Ms. Oldoerp.  (SSA 18).  Unlike Dr. Chafee, whose

13  examination was conducted without the benefit of past medical records, D'Lugoff rendered an

14  assessment based on all records submitted to the SSA in support of Oldoerp's claim.  Also unlike

15  Dr. Chafee, it appears that D'Lugoff did not conduct an in-person examination of Oldoerp.

16  D'Lugoff first summarizes his impressions of the medical records provided by Dr. Fry, the Mayo

17  Clinic, and Dr. Chafee.  D'Lugoff rejects Fry's February 13, 2008 diagnosis of fibromyalgia, noting

18  that Fry failed to reference the presence of "tender trigger points," a key criterion for establishing a

19  diagnosis of fibromyalgia.  *Id.*  The report concludes that "[f]ibromyalgia not [sic] established as a

20  medically-indicated impairment in this claimant's illness."  *Id.*  D'Lugoff goes on to describe

21  Oldoerp's symptoms observed at Mayo as representing a "classical presentation" of chronic fatigue

22  syndrome.  *Id.*  D'Lugoff's report indicates that these findings were buttressed by subsequent

23  observations from Fry in November 2007.  D'Lugoff further concludes that Chafee was "unaware of

24  EBVirus infection and the presence of adenopathy at the time of onset."  (SSA 18).

25      Based on the records from Chafee, Fry, and Mayo spanning August 2007 to June 2008,

26  D'Lugoff concluded that Oldoerp suffers from "severe" chronic fatigue syndrome adhering to CDC

27  diagnostic criteria.  *Id.*  According to the SSA diagnostic guidelines, a determination of "severe"

28  chronic fatigue syndrome indicates that D'Lugoff found that "fatigue, pain, neurocognitive

No. C 08-05278 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW

symptoms," or other symptoms "cause a limitation or restriction having more than a minimal effect"

on Oldoerp's ability to perform "basic work activities."  *See* SSA Program Operations Systems

(2001) (POMS), *available at* ECF No. 76. Exh. A.[3]

The following day, D'Lugoff completed a Physical Residual Functional Capacity

Assessment (RFC).  (SSA 9-16).  The RFC form allows the reviewing medical consultant to indicate

any exertional, postural, manipulative, visual, communicative, or environmental limitations imposed

by the claimant's diagnoses.  At the top of the RFC form, D'Lugoff rendered a primary diagnosis of

chronic fatigue syndrome and a secondary diagnosis of "HBP," presumably indicating high blood

pressure.  (SSA 9).  He also checked a box indicating that the RFC assessment is to serve as a

"[c]urrent" evaluation of Oldoerp's functional capacity.  *Id.*

The form lists a series of limitations, each accompanied by a blank box wherein the

reviewing consultant can insert a "check" mark indicating a particular functional limitation.  The

consultant is requested to "[c]heck the blocks which reflect your **reasoned judgment**." (SSA 9)

(emphasis added).  D'Lugoff checked boxes indicating that Oldoerp at the time was faced with the

following exertional limitations:

- Occasionally lift and/or carry ten pounds,

- Frequently lift and/or carry less than ten pounds,

- Stand and/or walk (with normal breaks) for a total of at least two hours in an
eight-hour work day,

- Sit (with normal breaks) for a total of about six hours in an eight-hour work
day, but must periodically alternate sitting and standing to relieve pain or
discomfort, and

- Push and/or pull (including operation of hand and/or foot controls) an
unlimited amount, excluding the aforementioned lift and carry restrictions.

(SSA 10.)[4]  At the bottom of the same page, the RFC form instructs, "Explain how and why the

evidence supports your [aforementioned] conclusions[.]"  After summarizing Oldoerp's symptoms

as gleaned from her records, D'Lugoff explained:

---

[3] The POMS, which is an official document published by the SSA and available to the public, is
judicially noticeable.  *See* FRE 201.

[4] D'Lugoff also checked boxes indicating the following restrictions: occasionally (as opposed to
"frequently" or "never") climb ramp/stairs, balancing, stooping, kneeling, crouching, and crawling;
"never" climb ladder/rope/scaffolds; limited ability to reach in all directions; limited handling (gross

United States District Court

For the Northern District of California

> This set of signs and symptoms meets CDC criteria for Chronic Fatigue Syndrome and credibly validates above exertional limitations. Stand and walk not to exceed 2 hours in 8 hour day. Sit 4 hours and alternate with stand 1 hour. Extensive bed-rest due to fatigue led to 60 lbs. weight-gain in this period.

*Id.* Later in the same report, D'Lugoff explains why his conclusions differ from those of Dr. Chafee, who had observed no functional restrictions:

> [Chafee] did not have the benefit of prior written [records] and so could not make the diagnosis of Chronic Fatigue Syndrome validating "extreme fatigue and diffuse myalgias, arthalgias" limiting exertional and postural maneuvers and so entered no RFC limitations ascribing condition to "possible depression."

(SSA 15).[5] On July 14, 2008, the SSA sent a letter notifying Oldoerp that she was entitled to monthly disability benefits beginning February 2008.[6]

## IV.   CONCLUSIONS OF LAW

### A.  Standard of Review

The Wells Fargo LTD Plan is governed by ERISA. A participant in an ERISA plan may bring a civil action to recover benefits, to enforce rights, or to clarify future rights under the terms of the plan. The Ninth Circuit held on appeal in this case that MetLife's decision is subject to de novo review. *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 500 F. App'x 575 (9th Cir. 2012). A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). Generally, the court's review is limited to the evidence

---

manipulation); and "avoid even moderate exposure" to vibration, fumes, odors, dusts, gases, "poor ventilation, etc.," and "hazards (machinery, heights, etc.)."

[5] According to SSA diagnostic guidelines, a diagnosis of CFS requires sudden onset of fatigue lasting at least six months. *See* SSA Program Operations Manual System (POMS) (2001), *available at* ECF No. 76, Exh. A. Accordingly, D'Lugoff's report indicates that, without the benefit of Oldoerp's medical records showing fatigue beginning in August 2007, Chafee was unable to corroborate the length of Oldoerp's fatigue.

[6] SSDI benefits have a five-month waiting period. 42 U.S.C. § 423(c)(2). According to Oldoerp, her SSDI eligibility beginning February 2008 signifies that the SSA concluded she became disabled some time during August 2008. Also, for purposes of SSDI, "disability" is defined as the "inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* § 423(d)(1)(A) (emphasis added). Oldoerp contends that this standard is more stringent than the "your occupation" standard of MetLife's LTD plan.

1    contained in the administrative record.  *Opeta v. Nw. Airlines Pension Plan for Contract Employees*,

2    484 F.3d 1211, 1217 (9th Cir.2007).  As discussed in Section II above and the prior order dated

3    November 25, 2013, however, Oldoerp's SSA record is admissible here because circumstances

4    clearly establish that it is necessary to conduct an adequate de novo review of MetLife's decision.

5    *See id.*

6            "In an ERISA case involving de novo review, the plaintiff has the burden of showing

7    entitlement to benefits."  *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d

8    1151, 1162 (N.D. Cal. 2010); *see also Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st

9    Cir. 2010) (placing burden on plaintiff to prove disability); *Sabatino v. Liberty Life Assurance Co.

10   of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) (same).  In conducting its de novo review,

11   the court "considers various circumstances when weighing evidence."  *Schramm*, 718 F. Supp. 2d at

12   1162.  For example, in *Saffron v. Wells Fargo & Co. Long Term Disability Plan*, the Ninth Circuit

13   noted that "[the administrator] had been paying [the claimant] long-term disability benefits for a

14   year, which suggests that she was already disabled."  522 F.3d 863, 871 (9th Cir. 2008).  The court

15   opined that to find the plaintiff no longer disabled, "one would expect the [evidence] to show an

16   *improvement*, not a lack of degeneration."  *Id.* (emphasis in original).  This language from *Saffron*

17   "does not impose a burden of proof on a defendant, but rather demonstrates a logical inference that a

18   court may make based on a specific set of facts."  *Schramm*, 718 F. Supp. 2d at 1162.  Thus, in

19   reviewing the administrative record and other admissible evidence, the court "evaluates the

20   persuasiveness of each party's case, which necessarily entails making reasonable inferences where

21   appropriate."  *Id.*

22           B.  Discussion

23           As plaintiff, Oldoerp has the burden of showing that she qualifies for additional benefits

24   under MetLife's LTD plan.  *See id.*  The MetLife plan provides that a claimant is "disabled" or has a

25   "disability" when "due to sickness (including a mental or nervous condition) . . . you are receiving

26   appropriate care and treatment from a doctor on a continuing basis . . . and you are unable to earn

27   more than 80 percent of your predisability covered pay or indexed covered pay at your own

28   occupation for any employer in your local economy."  AR 361.  After two years, the continuation of

No. C 08-05278 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  LTD benefits depends on the claimant being able to earn more than 60 percent of prior income in

2  "any gainful occupation."  *Id.*

3      The evidence establishes that Oldoerp began suffering from chronic fatigue syndrome and

4  other potentially disabling medical conditions in late 2007.  During the pendency of her claim with

5  MetLife, Oldoerp was examined on multiple occasions by a variety of medical professionals,

6  receiving a multitude of diagnoses in 2007 and 2008. At various points throughout the claims

7  process, different professionals concluded she suffered from depression, chronic fatigue syndrome,

8  fibromyalgia, generalized anxiety, panic disorder, and Bartonella.  While several of these diagnoses

9  are disputed, and although the parties now agree that Oldoerp did not have Bartonella, MetLife does

10  not contend that Oldoerp *never* suffered from a potentially disabling medical condition that

11  precluded her from working at Wells Fargo.[7]  Rather, the parties dispute whether the evidence

12  supports a conclusion that, after February 13, 2008, Oldoerp still qualified for LTD benefits under

13  the MetLife plan.

14      MetLife ceased Oldoerp's benefits as of February 13, 2008.  Although MetLife determined

15  that Oldoerp was entitled to STD and LTD benefits for the preceding five months, it concluded that

16  she was not functionally precluded from performing her occupation after that date.  The record

17  indicates, however, that Oldoerp's functional impairments persisted beyond February 13, 2008.  On

18  March 28, 2008, Dr. Rosdahl concluded that Oldoerp could only work for twenty hours a week, five

19  hours per day, but that "breaks must be allowed."[8]  Although Rosdahl's findings indicate an

20  improvement since late December, 2007, when she concluded that Oldoerp could work "zero" hours

21  per day, Rosdahl's March 2008 observations indicate that Oldoerp was still, pursuant to the MetLife

22  _____

23  [7] Indeed, after Oldoerp's first appeal, MetLife concluded that Oldoerp was entitled to one month of LTD benefits.  AR 753.

24  [8] In this same report, Rosdahl checked boxes indicating that Oldoerp could sit continuously for six hours, stand intermittently for two hours, and walk intermittently for three.  AR 718.  Rosdahl also

25  reported that she could occasionally lift up to fifty pounds, and that she could perform repetitive hand motions.  AR 719.  MetLife contends that these findings are in tension with Rosdahl's ultimate

26  conclusion that Oldoerp could work no longer than five hours per day.  As compared to her check marks accompanying pre-printed descriptions of certain functional limitations, Rosdahl's hand-

27  written findings (that Oldoerp can work only "20 hours/week") carry greater weight.  Examining the APS form in its entirety, it is clear that Rosdahl concluded that Oldoerp was unsuited for full-time

28  work.

United States District Court
For the Northern District of California

1   LTD plan, unable to earn eighty percent of her predisability pay in her "own occupation." (AR

2   361). The record also includes reports from Dr. Simonelic indicating that Oloerp's condition, which

3   had deteriorated significantly throughout her course of treatment with Simonelic, showed little

4   improvement after February 2008. In light of the fact that Simonelic treated Oldoerp longer and

5   more often than any other medical professional in the record, and considering the consistency of her

6   observations that Oldoerp's condition had deteriorated without significant improvement, her

7   conclusions are especially persuasive. In March 2008, Simonelic opined that Oldoerp was "unable

8   to perform any of her job functions[.]" (AR 756). In May 2008, she reported that Oldoerp had been

9   forgetting to attend her appointments -- behavior apparently uncharacteristic of the "efficient,

10  organized" manager Oldoerp was at the outset of her treatment. *Id.* During a May 2 phone call with

11  Dr. Murphy, Simonelic reported that Oldoerp had experienced only "slight" improvement. (AR

12  674).

13          In defending the propriety of its decision, MetLife emphasizes Rosdahl's observations

14  during the February 13, 2008 office visit. On that day, Rosdahl noted that Oldoerp had normal

15  blood pressure and observed that she was "constantly smiling" throughout the examination. (AR

16  768). During two other visits that same month, however, Rosdahl opined that Oldoerp was not yet

17  capable of returning to work. On February 6, she concluded that Oldoerp could not return to work

18  until April 2008. (AR 773-74). On February 26, less than two weeks after she observed that

19  Oldoerp had been "constantly smiling" with normal blood pressure, Rosdahl again reported that

20  Oldoerp could not return to work until April. (AR 765-66). MetLife argues that Rosdahl's

21  conclusions were not supported by clinical data. Given that MetLife seeks to discredit Rosdahl's

22  opinion that Oldoerp's symptoms precluded her from working, its simultaneous reliance on

23  Rosdahl's February 13, 2008 observations is not very compelling. Moreover, in light of MetLife's

24  conclusion that Oldoerp was already "disabled" under MetLife's STD and LTD plans for the

25  preceding five months, Rosdahl's February 13 observations -- coupled with Dr. Del Valle's

26  assertion that Oldoerp's antibiotic treatment was of a sufficient duration to address any underlying

27  Bartonella infection -- do not persuasively support MetLife's position that further LTD benefits

28  were unwarranted. *Cf. Saffron*, 522 F.3d at 871 (to find the plaintiff no longer disabled after already

United States District Court

For the Northern District of California

1    granting LTD benefits, "one would expect the [evidence] to show an *improvement*, not a lack of

2    degeneration") (emphasis in original); *see also Schramm*, ("Although Defendant did not need to

3    prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack

4    of consistent, marked progress is probative of her continuing disability.").

5        Moreover, during its final review of Oldoerp's claim, MetLife did not address whether

6    Oldoerp was mentally capable of performing her job.  As an Operations Manager for Wells Fargo,

7    Oldoerp was required to direct a team of consultants and analysts in the successful planning and

8    execution of "initiatives that are the most highly complex and strategic in nature." (AR 778).  She

9    was also tasked with "assist[ing] or determin[ing] size, scope, impacts, risk, budget and strategy for

10   initiatives that are corporate wide and have substantial impact to bottom line." *Id.*  Based on the job

11   description provided by Wells Fargo, Oldoerp's occupation required her to engage in tasks requiring

12   mental focus and complex thought.  On March 21, 2008, Simonelic concluded that, based on her

13   observations during counseling sessions, the patient had become "extremely fatigued" and "less

14   mentally alert."  According to Simonelic, Oldoerp experienced functional limitations making her

15   "unable to perform any of her job functions[.]"  (AR 756).  During its review of Oldoerp's final

16   appeal, however, MetLife did not sufficiently address whether the claimant's psychological

17   symptoms might functionally impact her ability to perform her job.  The first file reviewer, Dr.

18   Schmidt, did not assess whether any psychological symptoms might preclude Oldoerp from

19   working.  Instead, she opined solely on whether there was sufficient evidence of "physical

20   functional capacity impairment" after February 13, 2008.  (AR 639).  She expressly declined to

21   weigh in on Oldoerp's psychological symptoms, noting that Oldoerp was under Onacki's care "for

22   depression and anxiety which maybe [sic] causing a mental nervous impairment but I am not

23   qualified to comment on that."  *Id.*  Similarly, Dr. Bono's analysis did not address Oldoerp's

24   psychological condition.  "The claimant may have depression, chronic fatigue syndrome, and/or

25   fibromyalgia," he noted, "but there is no evidence for infectious disease in this case."  (AR 644).

26       Dr. Murphy, the only psychologist reviewing Oldoerp's final appeal, acknowledged

27   Oldoerp's depression but declined to address whether any of her psychological symptoms could

28   result in functional limitations on her ability to work:

United States District Court

For the Northern District of California

> The current evidence for functional limitations due to depression as a primary condition are not compelling as all the providers now appear to be in agreement that the claimant's fatigue is secondary to a physical condition.  I defer to the rheumatologist reviewing the file for the restrictions and limitations attributable to a physical condition.

(AR 660).  Accordingly, the psychologist tasked with reviewing Oldoerp's claim did not directly address the apparent severity of her psychological symptoms.  Regardless of whether her fatigue or other symptoms (such as depression, panic attacks, or loss of concentration) were "secondary" to a physical condition, Oldoerp was allegedly experiencing significant psychological symptoms that, according to her attending psychologist, had a significant impact on her ability to work.  (*See* AR 756).

Although psychologist Marcus J. Goldman weighed in during the pendency of Oldoerp's first appeal, opining that Oldoerp failed to demonstrate psychiatric functional limitations after November 2007, his conclusions are minimally persuasive.  Goldman's report hinges on the self-reported and subjective nature of Oldoerp's symptoms, noting that loss of global functionality "could not be objectively corroborated" and that "there was no quantified cognitive loss."  (AR 740).  While "subjective evidence of a disabling condition is inherently less reliable than objective evidence," *Langlois v. Metro. Life Ins. Co.*, 2012 WL 1910020, *14 (N.D. Cal. 2012), an ERISA plaintiff is nonetheless entitled to rely on credible subjective evidence in support of her claim.  In *Langlois*, the administrative record included certain medical opinions premised "entirely" on the claimant's self-reported symptoms of depression and anxiety.  *Id.*  These opinions were directly contradicted by objective evidence showing the claimant to be "within normal limits across all cognitive domains."  *Id.* at *5.  In particular, the plan administrator provided an independent medical examination (IME) wherein the claimant was subjected to comprehensive neurological testing.  When weighing the 38-page IME report against the aforementioned opinions which were premised solely on subjective symptoms, the court concluded that the objective evidence was more persuasive.  *Id.* at *14.  Here, unlike in *Langlois*, the record lacks persuasive objective evidence to rebut the credible evidence that Oldoerp was disabled beyond February 13, 2008.  Unlike the administrator in *Langlois*, MetLife did not request an IME to assess Oldoerp's condition.  Moreover,

United States District Court
For the Northern District of California

1    unlike Simonelic, who consistently observed Oldoerp throughout the pendency of her claim,

2    Goldman never examined Oldoerp.  While an ERISA plan administrator need not provide in-person

3    medical evaluations of its claimants, Simonelic's in-person observations are more persuasive than

4    Goldman's paper review.  *Cf. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th

5    Cir. 2011) (medical opinions rendered following in-person examination were more persuasive than

6    contrary opinions rendered following administrator's paper-only review); *see also Schramm*, 718 F.

7    Supp. 2d at 1164 ("The Court likewise gives little weight to the opinions of Drs. Marion and Fuchs.

8    Although they reviewed Plaintiff's medical records, they did not examine her in person.").

9            Finally, Oldoerp's award of Social Security benefits further reinforces her claim that she was

10   still disabled after February 13, 2008.  By determining that Oldoerp was disabled, the SSA

11   concluded she was incapable of engaging in "any substantial gainful activity" as a result of a

12   "medically determinable physical or mental impairment which can be expected to result in death or

13   which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42

14   U.S.C. § 423(d)(1)(A).  MetLife correctly notes that a diagnosis of a potentially disabling condition

15   cannot, without more, establish an entitlement to disability benefits.  *See Jordan v. Northrop*

16   *Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled on other*

17   *grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006) ("That a person

18   has a true medical diagnosis does not by itself establish disability. Medical treatises list medical

19   conditions from amblyopia to zoolognia that do not necessarily prevent people from working.").

20   Here, however, the SSA file contains more than a mere diagnosis.  After examining Oldoerp's

21   medical records, D'Lugoff concluded that Oldoerp's severe chronic fatigue syndrome imposed a

22   variety of functional impairments that would interfere with her ability to work.  Like Rosdahl's

23   March 28 report, D'Lugoff's RFC form describes functional limitations that would preclude

24   Oldoerp from performing the physical tasks required by her occupation.[9]

25

26   [9] Also like Rosdahl's March 28 report, D'Lugoff's RFC contains an inconsistency.  Although he
checked boxes indicating that Oldoerp could sit "about" six hours and stand and/or walk for "at

27   least" two hours in an eight-hour workday, he then explained in his own words that Oldoerp was to
"stand and walk not to exceed 2 hours" and "[s]it 4 hours and alternate with stand 1 hour."  (SSA

28   10).  D'Lugoff's typed explanation, in his own words, is a more compelling indicator of his
impression of Oldoerp's functional limitations.

1     MetLife emphasizes that D'Lugoff's report contradicts the June 2008 examination

2 conducted by Chafee, who observed Oldoerp in person and concluded that she suffered no

3 functional limitations.  Given that in-person examinations can prove more conducive to an accurate

4 assessment of a claimant's condition, Chafee's observations cannot be overlooked.  *Cf. Salomaa*,

5 642 F.3d at 676.  As noted above, when an in-person medical examination credibly contradicts a

6 paper-only review conducted by a professional who has never examined the claimant, the in-person

7 review may render more credible conclusions.  *See Schramm,* 718 F. Supp. 2d at 1164 (discounting

8 opinions of certain doctors who did not examine claimant in person).  Here, however, the claimant

9 suffers from a variety of self-reported symptoms that, especially in the absence of objective tests of

10 the sort seen in *Langlois*, are difficult to verify in a single examination.  *See* 2012 WL 1910020 at

11 *14.  Because Chafee's exam was conducted without the benefit of Oldoerp's medical records, he

12 had scant basis to corroborate Oldoerp's self-reported symptoms.  D'Lugoff, by contrast, was able

13 to review Oldoerp's record, including Chafee's findings, before determining that her symptoms

14 substantiated her claim of functional impairment due to chronic fatigue syndrome.

15     In sum, the evidence establishes that Oldoerp, more likely than not, was disabled under the

16 plan's terms beginning in August 2007.  The record further demonstrates that Oldoerp's disability

17 persisted after February 13, 2008.  To the extent Oldoerp demonstrated slight improvement in 2008,

18 her condition nonetheless persisted to preclude her from performing her own occupation.  Moreover,

19 the evidence does not support a conclusion that Oldoerp's statements, or her treating professionals'

20 observations and conclusions, lack credibility.  *See Schramm*, 718 F. Supp. 2d at 1165 (reinstating

21 LTD benefits after concluding that plaintiff presented sufficient evidence of her disability and

22 defendant failed to persuade the court that plaintiff or her physicians were not credible).

23 Accordingly, it was improper for MetLife to cease Oldoerp's LTD benefits.

24

25

26

27

28

1

**V.     CONCLUSION**

2      Oldoerp is entitled to the reinstatement of her LTD benefits beginning February 14, 2008.[10]

3  The parties are directed to meet and confer and jointly submit a proposed judgment consistent with

4  this order within thirty days.  A motion on attorney fees shall be filed within sixty days if the parties

5  are unable to agree on the amount.

6      IT IS SO ORDERED.

7

8  Dated:   1/27/14

    _____
9                                  RICHARD SEEBORG
                                    UNITED STATES DISTRICT JUDGE

10

11

**United States District Court**
For the Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____
    [10] The plan provides that after twenty-four months, the continuation of LTD benefits depends on the
28  claimant being able to earn more than sixty percent of her prior income in "any gainful occupation."
    AR 361.  This order does not address whether Oldoerp is disabled under this standard.

No. C 08-05278 RS
FINDINGS OF FACT AND CONCLUSIONS OF LAW